## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**CELENA GRANT,**

     *Plaintiff*,

 **v.**                       **Case No. 4:19cv610-MW/MAF**

**FLORIDA DEPARTMENT OF
CORRECTIONS,**

     *Defendant.*

_____/

### DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND, ALTERNATIVELY, FOR REMITTITUR OF DAMAGES

Defendant, FLORIDA DEPARTMENT OF CORRECTIONS ("Defendant"), through counsel and pursuant to Fed. R. Civ. P. 50 and 59 and N.D. Loc. R. 7.1, renews its motion for judgment as a matter of law in its favor or, alternatively, moves for remittitur of damages awarded and in support thereof states:

1.     This case proceeded to a jury trial on September 20, 2021. Plaintiff Celena Grant ("Plaintiff") in her Complaint alleged that she was the victim of race and gender[1] discrimination based on disparate pay, a disciplinary

_____

[1] In response to Defendant's Motion for Summary Judgment, Plaintiff dismissed her gender discrimination claims.

suspension, and ultimate termination; and retaliation for reporting discrimination based on her disciplinary suspension and ultimate termination from employment with FDC. [ECF 1-1].

2.     The Court granted in part and denied in part Defendant's Motion for Summary Judgment on March 11, 2021. [ECF 35]. In its Order, the Court found that there was "no evidence from which a reasonable jury could find that the decision maker's refusal to increase Grant's pay was racially motivated" [ECF 35, p. 2-3], but that "a reasonable jury could find in Plaintiff's favor on her retaliation claims." [ECF 35, p. 3].

3.     The Court concluded that the issue to continue to trial was whether the decision maker, Steven Fielder,[2] retaliated against Plaintiff for making complaints of race discrimination. [ECF 35, p. 3-4].

4.     The jury rendered a verdict in favor of Plaintiff and awarded her damages consisting of net lost wages and benefits, $300,000, and emotional pain and mental anguish, $700,000.

5.     During the trial, Defendant moved for judgment as a matter of law under Federal Rule of Civil Procedure 50. The Court took the motion under

---

[2] Plaintiff did not proceed on a Cat's Paw theory, so only the motivation of Mr. Fielder, as the decision maker, was at issue.

advisement and entered a written order denying the motion on September 23, 2021, after the jury had returned its verdict. [ECF 58].

6.    Judgment was entered May 31, 2022. [ECF 85].

7.    Defendant seeks judgment as a matter of law because the evidence presented at trial was not sufficient to allow the case to proceed to the jury or to support the jury's verdict. The record evidence was inadequate for Plaintiff to meet her burden to establish causation.

8.    In the event the Court determines judgment as a matter of law for Defendant is not appropriate, Defendant seeks reduction of the damages awarded in this case because the evidence presented at trial does not support the excessive awards for net lost wages and benefits or for emotional pain and mental anguish.

WHEREFORE, Defendant Florida Department of Corrections, requests this Court enter an order granting judgment as a matter of law in its favor, or alternatively, reducing the award of damages the jury awarded.

## MEMORANDUM OF LAW

## I.  JUDGMENT AS A MATTER OF LAW

### A. Federal Rule of Civil Procedure 50(b)

Rule 50(b) Fed. R. Civ. P. provides that a party may renew a motion for judgment as a matter of law within 28 days of the entry of judgment.

Rule 50 provides that a defendant may move for judgment as a matter of law "if there is no legally sufficient evidentiary basis" for a reasonable jury to find for Plaintiff on a material element of her cause of action. Fed. R. Civ. P. 50. A defendant is entitled to judgment as a matter of law when the plaintiff fails to present a sufficient evidentiary basis for a reasonable jury to find in her favor on a material element of her claim. *Davis v. Florida Agency for Health Care Admin.*, 612 F. App'x 983, 985 (11th Cir. 2015).

### B. Rule 50(b) Applied to Employment Retaliation Cases

To withstand judgment as a matter of law in an employment retaliation case, the Plaintiff must present evidence at trial that satisfies *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).

Under *McDonnell Douglas*, a Plaintiff must first show a *prima facie* case of retaliation with evidence that (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action; and (3) a causal connection existed between the protected activity and the adverse action. *Davis v. Florida Agency for Health Care Admin.,* 612 F. App'x 983, 985 (11th Cir. 2015).

If Plaintiff meets this burden, Defendant must introduce evidence of its legitimate non-retaliatory reason its action. *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000) (reference omitted).

If Defendant presents such evidence, Plaintiff must show pretext through a preponderance of the evidence that Defendant's proffered reasons for its decision are false and a "cover-up" for retaliation. *Robertson v. Interactive Coll. Of Tech./Interactive Learning Sys., Inc.*, 743 F. App'x 269, 274 (11th Cir. 2018). Plaintiff cannot simply just show the reasons proffered Defendant were false. *Lee,* 226 F.3d at 1253. She must show that retaliatory animus was the but-for cause of the challenged adverse action. *Davis v. Florida Agency for Health Care Admin.*, 612 F. App'x. 983, 986 (11th Cir. 2015). Moreover, she cannot establish pretext "merely by questioning the wisdom of the [Defendant's] reasons, at least not where the reason is one that might motivate a reasonable employer." *Davis v. NPC Pizza Hut,* 226 F. Appx. 890, 891 (11th Cir. 2007) (quotation omitted); *see also Lewis v. Blue Bird Corp.*, 835 F. App'x 526, 530 (11th Cir. 2020) ("When an employer asserts that it has fired an employee based on reported workplace incidents, the employee must not only dispute that those incidents occurred, but also call into question the employer's sincere belief that they occurred.") (citing *Vessels v. Atl. Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005)).

### C. Summary of Defendant's Evidence of the Basis of Mr. Fielder's Dismissal Decision

It is not in dispute that Steven Fielder, who at the time was FDC Chief of Staff [Tr. 188:14-14], was the sole decision maker with respect to Plaintiff's dismissal. [Tr. 580:13-19]. The evidence showed that Mr. Fielder made his decision to dismiss Plaintiff based on the information contained in memos prepared by Plaintiff's supervisors, Amy Bryant and David Arthmann. [Tr. 217:4-10].

In her memo, Ms. Bryant listed the following specific incidents in support of her request for discipline: (1) Plaintiff's failure to provide hands-on assistance during the Hurricane Irma Cleanup Audit special project; (2) Plaintiff's unprofessional conduct during a meeting with Ms. Bryant; and (3) Plaintiff's failure to communicate with Ms. Bryant about a decision about a payroll process. [Exhibit 27].

In his memo, Mr. Arthmann listed additional incidents and issues: (4) the Payroll section's overpayment of Captain Washington; (5) the Payroll section's sending of overpayment letters without adequate quality assurance; (6) Plaintiff's failure to develop a paperless timesheet process; and (7) Plaintiff's lack of willingness to be open to a payroll process recommended by the office of general counsel. [Exhibit 28].

The evidence presented on these seven issues is described below.

### *(1)    Hurricane Irma Cleanup Audit*

The first issue discussed by Ms. Bryant in her memo to Mr. Arthmann related to the Hurricane Irma Cleanup Audit. [Exhibit 27].

Defendant presented evidence that after Hurricane Irma, a major issue arose with timesheet miscoding. Thousands of employees entered the wrong code on their timesheets during an office closure, resulting in statewide problems with employee leave and pay. Correcting the errors required "all-hands-on-deck" in HR. [Tr. 535:16-538:9]. Ms. Bryant testified that she instructed Plaintiff to assign herself timesheets to correct herself. However, a report later showed that Plaintiff only corrected one timesheet herself. [Tr. 358:17-359:7].

Plaintiff did not dispute that Ms. Bryant instructed her to complete timesheet corrections, that the report showed she only completed one timesheet herself, or that there were others who, according to the report, completed hundreds of timesheets during the project. [141:7-20]. Despite agreeing that Ms. Bryant had instructed her to do this hands-on work, Plaintiff testified that her job was to ensure that other staff understood the process. [Tr. 161:11-20]. Moreover, Plaintiff's subordinate, Sharolyn Wood, testified that because Plaintiff was a manager, she did not know how to correct a timesheet and Ms. Wood had to explain it to her. [Tr. 429:9-430:7].

Another one of Plaintiff's subordinates, Stella Harris, testified that Plaintiff was present when she was working on the project and she, along with Plaintiff, Ms. Wood, and two other staff members, sat together in a conference room and worked on "exceptional" timesheets. [Tr. 418:18-419:10]. The report showed that Ms. Harris corrected 46 timesheets and Ms. Wood corrected 206. [Tr. 569:13-24].

Plaintiff presented no evidence to suggest that the report, which was admitted as part of Exhibit 26, was inaccurate. Likewise, she presented no evidence to suggest that Mr. Fielder did not rely on Ms. Bryant's or Mr. Arthmann's description of Plaintiff's failure to participate in the project as expected when he made the dismissal decision, or that it was not reasonable to rely on the information they provided.

### (2)   *Meeting with Ms. Sadberry*

The second issue raised by Ms. Bryant in her memo to Mr. Arthmann related to a meeting between herself, Plaintiff, and Brenda Sadberry. [Exhibit 27].

Ms. Bryant testified that during a discussion about a workers' compensation issue, she asked Ms. Sadberry for input, and Plaintiff told Ms. Sadberry not to answer Ms. Bryant and to leave Ms. Bryant's office. [Tr. 351:11-353:5].

Though Plaintiff's recollection of the tone of the conversation differs slightly from Ms. Bryant's, she admitted that after Ms. Bryant asked Ms. Sadberry for input, she did ask for Ms. Sadberry to be excluded from the conversation. [Tr. 142:2-143:4].

Plaintiff presented no evidence to suggest that this incident did not occur. Likewise, she presented no evidence to suggest that Mr. Fielder did not rely on Ms. Bryant's description of the incident when he made the dismissal decision, or that it was not reasonable to do so.

### (3)  *Failure to communicate about payroll process decision*

The next issue Ms. Bryant discussed in her memo to Mr. Arthmann was Plaintiff's failure to inform her that the payroll section had already established a particular payroll process, even though Ms. Bryant met with the Plaintiff, they together agreed on a different process, and Ms. Bryant then presented the process at a meeting with other HR staff.  Ms. Bryant identified this incident as an example of Plaintiff's poor communication with leadership. [Exhibit 27].

Plaintiff offered no evidence to suggest the incident did not happen as described in Ms. Bryant's memo.  Likewise, Plaintiff presented no evidence to suggest that Mr. Fielder did not rely on Ms. Bryant's description of the

issue when he made the dismissal decision, or that it was not reasonable to do so.

### (4)  Overpayment of Captain Washington

In his memo to Mr. Fielder, Mr. Arthmann identified Plaintiff's handling of the overpayment of Captain Washington as support for his disciplinary recommendation. [Exhibit 28].

Mr. Arthmann testified that Captain Washington was overpaid approximately $20,000 upon his retirement because of a payroll error, that Mr. Arthmann instructed Plaintiff's section to correct it, and that the repayment calculation the Plaintiff's section subsequently provided to Captain Washington was incorrect. [Tr. 396:19-25]. Mr. Arthmann testified that this overpayment issue was not uncommon in Plaintiff's section and arose in part because of the section's failure to effectively communicate with the rest of the agency. [Tr. 398:19-399:15].

Plaintiff offered no evidence to suggest the incident did not happen as described in Mr. Arthmann's memo. Likewise, Plaintiff offered no evidence to suggest that Mr. Fielder did not rely on Mr. Arthmann's description of the issue when he made the dismissal decision, or that it was not reasonable to do so.

### (5) *Sending overpayment letters without quality assurance*

Another issue identified by Mr. Arthmann was Plaintiff's team's failure to have proper processes in place to handle instances of employees being overpaid. [Exhibit 28].

Mr. Arthmann testified that such issues were significant because overpaid employees were required to repay the agency, creating additional work for staff. [Tr. 391:22-392:5]. Mr. Arthmann testified that he directed Plaintiff to "loop in" the legal department before sending out overpayment letters because overpaid employees can request hearings with the Division of Administrative Hearings upon receiving overpayment notices. However, the payroll section was systematically not involving legal in that process. [Tr. 399:1-15].

Plaintiff offered no evidence to suggest that she followed Mr. Arthmann's directions and vetted overpayment letters with legal. Likewise, Plaintiff offered no evidence to suggest that Mr. Fielder did not rely on Mr. Arthmann's description of the issue when he made the dismissal decision, or that it was not reasonable to do so.

### (6) *Failure to develop a paperless timesheet process*

Mr. Arthmann also referred in his memo to Plaintiff's failure to develop a paperless timesheet process as instructed. [Exhibit 28].

Mr. Arthmann testified that he "asked her over and over again to come up with a paperless system or a paperless process to track that and do that," but she did not, and a paperless timesheet system was not ultimately implemented until after her dismissal. [Tr. 396:3-12]. When asked on cross examination, Mr. Arthmann explained that Plaintiff had merely begun a workgroup to develop a process. [Tr. 410:2-5].

Other than having started a work group to examine the issue, Plaintiff offered no evidence to suggest that she made any significant steps toward implementing a paperless timesheet system. Likewise, Plaintiff offered no evidence to suggest that Mr. Fielder did not rely on Mr. Arthmann's description of the issue when he made the dismissal decision, or that it was not reasonable to do so.

### (7)   Lack of willingness to implement payroll process recommended by the Office of the General Counsel

Finally, Mr. Arthmann identified in his memo Plaintiff's opposition to advice from legal regarding how to handle a payroll issue related to an employee named Coty Stone. [Exhibit 28].

Mr. Arthmann testified that Mr. Stone was a correctional officer who was also in the military, and who had sought assistance with the Police Benevolence Association regarding how the agency was handling his military leave. After the Office of the General Counsel examined the issue and

provided advice, Mr. Arthmann approached Plaintiff about how to proceed, but she rejected the legal advice and recommended that no change be made to how the issue was being handled. Mr. Arthmann testified "that doesn't work for having to go into a meeting and explain to a member and to their counsel why, you know, the status quo is where we need to be at when we have legal providing some other indications on it." [Tr. 400:15-25].

The only evidence Plaintiff offered to counter Mr. Arthmann's testimony was that her recommendation was based on guidance from the Department of Management Services. [Tr. 410:23-411:8]. She offered no evidence to suggest that Mr. Fielder did not rely on Mr. Arthmann's description of the issue when he made the dismissal decision, or that it was not reasonable to do so.

Defendant established that these seven issues occurred and were reported to Mr. Fielder, that Mr. Fielder considered them, and that his dismissal decision was based on them. Plaintiff did not prove that any of the issues did not occur, or that Mr. Fielder did not rely on them in making his decision, or that it was unreasonable for him to do so.

### D. Summary of Plaintiff's Evidence of Causation

In its Order Denying FDC's Motion for Judgment as a Matter of Law, this Court explained that despite the lack of temporal proximity, Plaintiff

presented "other evidence" supporting causation "from which a jury could conclude that Mr. Fielder did not in good faith rely on false reports of mismanagement but terminated Plaintiff because of her complaints." [ECF 58].

Each piece of evidence discussed by the Court is examined in turn below.

### (1)    Ms. Dandelake's Investigation

First, the Court found that a jury could reasonably infer causation from the manner in which Ms. Dandelake investigated Plaintiff's initial internal complaint because it was based on interviews of random HR employees and, "despite the fact that Ms. Dandelake's report found that Ms. Bryant was a bad manager, and that Mr. Shively discriminated against Black employees, Mr. Fielder promoted Ms. Bryant and suspended Plaintiff in part based on information he had received from Mr. Shively." [ECF 58, p. 3].

Ms. Dandelake's report did not, in fact, find "that Mr. Shively discriminated against Black employees." While the report included a statement from one HR employee that "[w]hen Brett Shively passes you in the hall, he speaks to white employees and not black employees," this is far from a finding that Mr. Shively discriminated against Black employees. The finding that one employee felt that Mr. Shively spoke to White employees in

the hall and not Black employees does not render Mr. Fielder's reliance on information about Plaintiff unreasonable, especially in light of the numerous other sources whose assessment of Plaintiff mirrored the information received from Mr. Shively and Ms. Cowan. Indeed, Mr. Fielder testified that Janie Westberry, Debra Zieja, David Vermette, and Brad Nestor all provided information to him that was consistent with the reports he received from Ms. Cowan and Mr. Shively that Plaintiff made errors, did not take responsibility, that one of Plaintiff's employees left because of the work environment, and that the payroll section did not provide good customer service. [Tr. 583:24-586:17]. Plaintiff offered no evidence to contradict the reports that Mr. Fielder received from these employees.

Furthermore, it is significant that Mr. Fielder relied on Ms. Dandelake's report in the disciplinary decisions related to all three employees. To conclude that the way in which the investigation was conducted constituted evidence of retaliation against Plaintiff ignores the fact that Mr. Shively and Ms. Cowan, neither of whom had engaged in any protected activity, were also demoted in part as a result of Ms. Dandelake's findings.

Ms. Dandelake's report is not "other evidence" of causation.

### (2)   Discussions of Plaintiff's Complaints

Second, the Court found that the fact that Mr. Fielder warned Ms. Bryant and Mr. Arthmann about Plaintiff's EEOC complaint, and the fact that the disciplinary action worksheet referenced Plaintiff's EEOC complaint, was evidence from which a jury could conclude that Mr. Fielder considered the complaint a problem. [ECF 58, p. 3-4].

To the contrary, Mr. Fielder explained that he discussed Plaintiff's claims with Mr. Arthmann and Ms. Bryant because they

> needed to understand the dynamic that I was asking them to improve upon. There was dysfunction in HR, and there was dysfunction in the payroll section. And I needed them to understand the – what was going on around them so that they could help fix it.

[Tr. 204:4-15]. It is not reasonable to infer that a manager who sees disfunction manifesting in the filing of an EEOC complaint and who tells new supervisors about the disfunction and instructs them to do something about it, is showing retaliatory intent. The reasonable inference from Mr. Fielder's testimony is that he wanted the new supervisors to improve the working environment in the section.

Likewise, it is not reasonable to infer retaliatory intent from the fact that the disciplinary action worksheet noted that there was an active EEOC complaint. No evidence was presented that Mr. Fielder prepared the

worksheet or considered anything on the worksheet when making his decision. Certainly, the evidence indicates that Mr. Fielder knew about the complaint – but that was not in dispute. Nothing more than Mr. Fielder's knowledge of the complaint can be inferred from the worksheet.

Neither placing Mr. Arthmann and Ms. Bryant on notice of the turmoil in HR, nor the mention of the pending EEOC investigation on the disciplinary action worksheet, is "other evidence" of causation.

### (3)   *Mr. Fielder's Affidavit to the EEOC*

Third, the Court found that the evidence "suggested that Mr. Fielder misrepresented the nature of Mr. Shively's and Ms. Cowan's demotions to the Florida Commission on Human Relations in an attempt to make Defendant's case look stronger." [DE 58, p. 4].

Mr. Fielder testified that he wrote in his affidavit to the EEOC that "after discussing these deficiencies, Mr. Shively and Ms. Cowan voluntarily transferred to other positions within the department." [Tr. 595:10-13]. Nothing about Mr. Fielder's sworn statement was false. He did not assert in the affidavit that the transfers were lateral, or that the new positions had the same pay or level of responsibility, or that either employee was happy about the transfer. There is no evidence that Mr. Shively or Ms. Cowan grieved or

otherwise objected to the demotions. As Mr. Fielder testified, demotions and voluntary transfers are not mutually exclusive actions. [Tr. 595:23-24].

Mr. Fielder's description of Mr. Shively's and Ms. Cowan's demotions as voluntary is not "other evidence" of causation.

### (4)    "New Reasons" for Plaintiff's Dismissal

Fourth, the Court found that "Defendant struggled to pin down the exact reasons Mr. Fielder terminated Plaintiff, with new reasons emerging as late as the final day of trial." [ECF 58, p. 4].

As an initial matter, it must be noted that Defendant did not begin to put on its defense until the final day of trial. While Mr. Fielder was cross-examined during the Plaintiff's case, Defendant had no obligation to exhaust or fully develop his testimony until it called him to the stand. Second, Mr. Fielder's reason for dismissing Plaintiff did not change. On direct examination during the Plaintiff's case, Mr. Fielder testified that his dismissal decision was based on the information in Mr. Arthmann's and Ms. Bryant's memos. [Tr. 217:4-10]. On cross-examination during the Plaintiff's case in chief, Mr. Fielder described, generally, the nature of the issues raised about Plaintiff over the course of the years as

> not taking responsibility for some issues, not showing leadership in the section and an unacceptable level of errors. Again, no one is going to be perfect 100 percent of the time. And, you know, it's a large agency, I understand that, and I do get that, right. But this

> was – the continued ongoing issues and behaviors and mistakes
> and errors and not taking responsibility for those errors was
> problematic.

[Tr. 238:20-239:6]. None of the issues, incidents, or justifications of

dismissal that Mr. Fielder testified about on day one or day three of the trial

fall outside the area of "not taking responsibility for some issues, not showing

leadership in the section and an unacceptable level of errors." No "new

reason" emerged on the final day of trial. None of the issues that Mr. Fielder

testified about were contrary to the memos prepared by Ms. Bryant or Mr.

Arthmann. That Mr. Fielder did not testify during the Plaintiff's case in chief

about every incident that was reported to him or every individual with whom

he had discussion about Plaintiff does not suggest causation.

Mr. Fielder's additional of examples of the Plaintiff's deficiencies was

not "other evidence" of causation.

### *(5)   Ms. Cowan's and Mr. Shively's Demotions*

Fifth, the Court found that the jury could infer retaliatory intent from

Mr. Fielder giving Ms. Cowan and Mr. Shively the "benefit of the doubt" by

demoting them, and not extending that "courtesy" to the Plaintiff. [ECF 58,

p. 4].

Such an inference ignores the timeline. Mr. Shively and Ms. Cowan

were demoted in early 2018. At that time, Plaintiff was suspended; she was

not dismissed or demoted. All three were given the "benefit of the doubt" at that time and arguably Plaintiff was given the most benefit as she was the only to retain her position. Plaintiff presented no evidence to suggest that after their demotions Mr. Shively or Ms. Cowan exhibited any similar performance or leadership issues to warrant further discipline. It is not reasonable for a jury to compare Plaintiff's dismissal, after she had been issued a conduct and performance notice and a suspension for similar issues, to Mr. Shively's and Ms. Cowan's demotions when they had no prior discipline.

That Mr. Shively and Ms. Cowan were not dismissed is not "other evidence" of causation.

### (6) Mr. Fielder's "Equivocation"

Sixth, the Court found that a jury could conclude that Mr. Fielder and Ms. Cowan were untruthful because Mr. Fielder "repeatedly equivocated when asked whether Ms. Cowan's and Mr. Shively's demotions were voluntary; Ms. Cowan did the same." [ECF 58, p. 4].

Ms. Cowan testified that "Mr. Fielder asked me to step down, so I didn't feel like I had much of a choice." [Tr. 315:4-21]. This does make characterizing the transfer as "voluntary" inaccurate. Plaintiff offered no evidence that Ms. Cowan grieved the demotion, challenged it, or otherwise

refused to accept it. And to the extent that Mr. Fielder had difficulty answering the line of questioning about whether the demotions were voluntary or not, that was the result of the manner in which the question was asked. Mr. Fielder was asked on cross examination during the Defendant's case

> [h]ave you ever sworn under oath that they voluntarily transferred those positions, *not as a demotion*."

(emphasis added). Mr. Fielder responded

> I would characterize them as demotions.

The follow up question was

> so your testimony here today is that you have never sworn under oath that they voluntarily transferred their positions within the department.

Mr. Fielder answered

> It's almost like a double negative question, so that's why I'm struggling. I would have characterized them as demotions. I don't think I ever would have said – they did it voluntarily in the sense that their other option would have been to resign.

[Tr.594:13-23]. When Mr. Fielder was finally read the sworn statement that he had signed and asked whether his statement was

> in January 2018, after discussing these deficiencies, Mr. Shively and Ms. Cowan voluntarily transferred to other positions with the department.

Mr. Fielder answered

> [y]es. And they did.

[Tr. 595:10-14]. Clearly, Mr. Fielder's equivocation was a result of the extraneous "*not a demotion*" inserted by Plaintiff's counsel into his sworn statement. Mr. Fielder explained that a demotion can be voluntarily. It is not reasonable to conclude from this testimony, elicited by an inaccurately loaded question, that Mr. Fielder was dishonest.

The perception of an inconsistency between a "voluntary transfer" and a demotion, in this context, is not "other evidence" of causation.

### *(7)   Testimony of Plaintiff's Subordinates*

Seventh, the Court found that a jury could believe "the multiple witnesses who testified that Plaintiff was an excellent supervisor and that Defendant's complaints about her were unfounded." [Tr. 58, p. 4-5].

Ms. Harris, Ms. Wood, and Ms. Gilliam testified that Plaintiff was a good manager. However, none were asked about any of the specific incidents recited in Mr. Arthmann's or Ms. Bryant's memos. None of these three witnesses offered any evidence to counter the testimony regarding the Captain Washington overpayment, the information in the Hurricane Irma Timesheet Audit report, the incident with Ms. Sadberry, or any other issue raised in the two memos. Moreover, the fact that Plaintiff's subordinates thought she was a good manager is not evidence that she was managing in accordance with her supervisors' directives. *See Rojas v. Florida*, 285 F.3d

1339, 1343 (11th Cir. 2002) (holding that evidence that dismissed employee's prior supervisors praised her work and characterized as one of the best employees was not evidence of pretext).

Plaintiff's subordinate's testimony that she was a good supervisor is not "other evidence" of causation.

### E. Plaintiff Did Not Offer "Other Evidence" of Causation and Did Not Rebut Defendant's Evidence Justifying its Dismissal Decision

Having failed to rebut Defendant's evidence to support Mr. Fielder's dismissal decision and having failed to link her dismissal to her protected speech, it is clear that Plaintiff did not meet her burden to show causation at the *prima facie* stage, or to ultimately show that Mr. Fielder's explanations were pretextual and his retaliatory animus was the but-for reason for his decision.

Plaintiff filed her Charge of Discrimination March 8, 2018. [Exhibit 34], She was dismissed August 27, 2018. [Exhibit 29]. Where a "substantial delay" occurs between an employee's protected expression and a subsequent adverse employment action, a retaliation claim fails as a matter of law unless there is "other evidence tending to show causation." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).

Plaintiff offered no evidence of any adverse actions that occurred between the two events, and the passage of more than five months is a "substantial delay." *Thomas*, 506 F.3d at 1364. Therefore, in order to show the causation element of a *prima facie* case of retaliation, Plaintiff was required to present "other evidence" that her speech and dismissal were related. *Henderson v. FedEx Express*, 442 Fed. Appx. 502, 506 (11th Cir. 2011) (affirming summary judgment for employer where employee did not submit evidence linking his dismissal to his complaint).

Plaintiff did not show such evidence. The evidence that Mr. Fielder discussed Plaintiff's complaint with Mr. Arthmann and Ms. Bryant, the confusion between a demotion and a voluntary transfer, the comparison of Ms. Cowan's and Mr. Shively's demotions to Plaintiff's suspension, and the adequacy of Ms. Dandelake's investigation, bear no relation to and are not "other evidence" of causation.

Moreover, even if Plaintiff's evidence was sufficient to establish a *prima facie* case, it was nevertheless insufficient to meet her ultimate burden to show that the but-for cause of her termination was retaliation. As Plaintiff did not base her claim on a cat's paw theory [Tr. 464:13-15], and as FDC proffered a legitimate, non-retaliatory reasons for Plaintiff's dismissal, Plaintiff was required to show that the decision maker, Mr. Fielder, made the

dismissal decision with retaliatory animus. [DE 35, p. 3]. To do so, Plaintiff was required to show, not only that the information supplied to Mr. Fielder by Mr. Arthmann and Ms. Bryant was false, but that Mr. Fielder did not have a good faith basis to rely on it. *Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1148 (11th Cir. 2020). *See also See Alvarez v. Royal Atl. Devs., Inc.,* 610 F.3d 1253, 1266 (11th Cir. 2010) ("The inquiry into pretext centers on the employer's beliefs . . . not on reality as it exists outside of the decision maker's head.").

The evidence offered by Plaintiff at trial did not rebut the information provided by Mr. Arthmann and Ms. Bryant, was not such that a reasonable jury could find that Mr. Fielder was unreasonable in relying upon it when he made his dismissal decision and did not show that he acted with retaliatory intent. Accordingly, Defendant is entitled to judgment in accord with its motion for directed verdict.

## II.  REDUCTION OF DAMAGES

### A. Federal Rule of Civil Procedure 59

Federal Rule of Civil Procedure 59(e) permits a party to move to alter or amend a judgment. An order reducing a jury's award to those proven at trial is appropriate where "the jury's damage award exceeds the amount

established by the evidence." *Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1448 (11th Cir. 1985).

### B. Allowable Damages under Title VII and the Florida Civil Rights Act

Plaintiff was awarded damages in this case under the Florida Civil Rights Act and Title VII of the Civil Rights Act of 1964. Both statutes allow the recovery of back pay and compensatory damages. § 42 USC 2000e-5(3)(B); 42 U.S.C.A. § 1981a; § 760.11, Fla. Stat.

However, Title VII limits compensatory damages, which include those intangible damages for emotional pain and mental anguish, to fixed amounts based on the size of the employer. Because the Florida Department of Corrections employs more than 500 people, up to $300,000 may be awarded under Title VII. § 1981a(b)(3)(D). Florida's limited waiver of sovereign immunity, which applies to claims under the Florida Civil Rights Act, caps judgments at $200,000. § 768.28, Fla. Stat.; § 768.11(5) ("[t]he total amount of recovery against the state and its agencies and subdivisions shall not exceed the limitation as set forth in s. 768.28(5)).

These two amounts cannot be combined, and Plaintiff's compensatory damages award is therefore capped at $300,000. *See Bradshaw v. Sch. Bd. of Broward Cnty., Fla.*, 486 F.3d 1205, 1209 (11th Cir. 2007) (explaining

that damages awarded under both Title VII and the Florida Civil Rights Act cannot be stacked to exceed the highest of the two applicable caps).

To recover more than nominal damages for emotional pain and mental anguish in an employment retaliation case, a Plaintiff must prove actual injury. *Bernstein v. Sephora, Div. of DFS Group L.P.*, 182 F. Supp. 2d 1214, 1227 (S.D. Fla. 2002) (citing *Carey v. Piphus,* 435 U.S. 247, 263–64 (1978)). In determining the appropriate amount of damages for emotional pain and mental anguish, courts have considered

> (1) whether the plaintiff lost the esteem of her peers; (2) whether the plaintiff suffered physical injury as a consequence of her emotional distress; (3) whether the plaintiff received psychological counseling or other medical treatment; (4) whether the plaintiff suffered a loss of income; (5) the degree of emotional distress; (6) the context of the events surrounding the emotional distress; (7) the evidence tending to corroborate the plaintiff's testimony; (8) the nexus between the challenged conduct and the emotional distress; and (9) any mitigating circumstances.

*Stone v. GEICO Gen. Ins. Co.*, 2009 WL 3720954, at *6 (M.D. Fla. Nov. 5, 2009) (reducing jury award of $200,000 in compensatory damages to $50,000).

## C. Summary of Evidence Offered at Trial Relevant to Plaintiff's Net Lost Wages and Benefits

At trial, Plaintiff testified that her biweekly salary at the Department of Corrections was $2,782.60. [Tr. 439:6-8]. She was unemployed for the period of August 28, 2018, until December of 2018. [Tr. 440:10-12].

Beginning in January 2019, Plaintiff worked 40 hours per week for Career Source Capital Region earning $20 hourly, or $1,600 weekly. [Tr. 437:9-20]. Plaintiff left that position in July of 2019 and began working at Coloney Bell where she earned $55,000 per year, or $2,115.38 biweekly. [Tr. 439:9-21]. The evidence regarding Plaintiff's lost wages is summarized as follows:

| Time Period | 8/28/2018-12/31/2018 (18 weeks) | 1/1/2019-7/15/2019 (28 weeks) | 7/15/2019-9/22/2021 (114 weeks) | Total |
| --- | --- | --- | --- | --- |
| Lost Wages | $25,043.40 | $38,956.40 | $158,608.20 | $222,608.00 |
| Earned Wages | $0 | $22,400.00 | $120,576.92 | $142,976.92 |
| Difference | $25,043.40 | $16,556.40 | $38,031.28 | $79,631.08 |

The Plaintiff also testified that she received health insurance through her employment with FDC, which she paid $50 a month for. She did not provide any evidence of the value of her health insurance, but testified that she paid $600 monthly beginning in October 2018 through beginning full time work with Coloney Bell. [Tr. 441:18-442:12]. Therefore Plaintiff paid out of pocket an additional $550 monthly for health insurance for a period of ten months, or $5,500.

Plaintiff further testified that she lost her matching retirement contribution but could only testify that the state matched her contribution of 3 percent. [Tr. 441:12-17]. Three percent of Plaintiff's salary through the date of the jury's verdict is $6,678.24.

Accordingly, the total amount of net lost wages and benefits proven at trial was, at most, $91,809.32.[3]

### D. Summary of Plaintiff's Evidence of Emotional Pain and Mental Anguish

With respect to emotional pain and mental anguish, Plaintiff testified

> And I am still to this day having a hard time completely recovering from the experience at Department of Corrections. There were a lot of people that I cared about deeply. I cared about the work and I tried very, very hard to meet the expectations of management, myself, and my team. Probably around 2015, '16, when things started getting really more difficult, I started experiencing depression and anxiety attacks. I have since lost a lot of weight, an extreme amount of weight because the emotional toll has been one that I could not have truly understood that I would be so hurt. I was diagnosed with major depression. And I come from strong faith and it was very hard for me to acknowledge that I needed help. I lost my confidence, which I still haven't fully regained. There's an element of embarrassment because I wanted to do good. I wanted to be good representatives of my parents, whom I had to borrow money from for the first time in my life, and that was very difficult. Despite their reassurances, it was very difficult because I always wanted to be in the position that at the ages that they are that I would be taking care of them. So this has been very difficult, a tremendous amount of sadness. And I've done a lot of reflecting, and I'm just very hopeful that the healing will come sooner rather than later.

[Tr. 443:1-25].

Plaintiff's own testimony shows that her emotional pain and mental anguish began *prior* to the alleged retaliation, in 2015 or 2016. She testified

---

[3] Lost wages of $79,631.08 + lost health insurance premiums of $5,500.00 + lost retirement contributions of $6,678.24.

that she has not regained her confidence, despite having been offered numerous jobs since her dismissal.

Plaintiff did not offer evidence of most of the considerations examined in *Stone v. GEICO Gen. Ins. Co*. The Plaintiff did not testify that she lost the esteem of her peers, suffered physical injury, received psychological counseling or other medical treatment, and she offered no evidence other than her own testimony about her emotional pain and mental anguish.

**E. Reduction of the Jury's Damages Verdict is Required**

The jury awarded Plaintiff $700,000 for emotional pain and mental anguish, and $300,000 for net lost wages and benefits [ECF 56], although in closing arguments, counsel for Plaintiff estimated that figure to be only $75,912.35. [Tr. 644:14-15].

Based on the evidence presented at trial, the jury's net lost wages and benefits award must be reduced to, at most, $91,809.32.

Furthermore, Plaintiff's testimony does not support the excessive jury award of $700,000 for emotional pain and mental anguish. Plaintiff did not offer any proof that her emotional pain and mental anguish were tied to alleged retaliatory conduct by FDC, rather than issues that predated any protected conduct or alleged retaliatory treatment.  [Tr. 442:23-443:25] Even if the Plaintiff had offered proof tying her alleged emotional pain and

mental anguish to FDC's alleged retaliatory conduct, Plaintiff described only "garden variety" emotional distress. *See Winstead v. Lafayette Cnty. Bd. of Cnty. Commissioners*, 315 F.R.D. 612, 615 (N.D. Fla. 2016) (describing "garden variety emotional distress" as "anxiety, humiliation, shame, embarrassment, mental suffering, and distress that may flow naturally from an event that is an affront to one's dignity"). Because Plaintiff's testimony was limited, there was no corroboration from any medical provider, and causality between the harm and the stated issues was not clear, the jury's award was excessive. *Hill v. Airborne Freight Corp.,* 212 F.Supp.2d 59, 73-74 (E.D.N.Y. 2002) (comparing cases "entailing a plaintiff's general testimony of humiliation and stress, without medical corroboration" where damages "have generally been awarded in the range of $5,000 to $100,000"); *Borja–Fierro v. Girozente Vienna Bank,* No. 91 Civ. 8743, 1994 WL 240360, at *3-4 (S.D.N.Y. May 27, 1994) (analyzing case where testimony about distress was "brief, not particularly strong, and included a single reference to a visit to a psychologist," and finding "no case based on similar facts in which an award of over $15,000 was upheld; in the vast majority of cases, courts found awards of $5,000 to $10,000 to be appropriate").

The jury's award of $700,000 for emotional pain and mental anguish must be reduced to, at most, $300,000 based on Title VII's limits, and should be reduced to no more than $20,000 to conform to the evidence presented at trial. *See Austin v. FL Hud Rosewood LLC*, 2018 WL 10509898, at *5 (N.D. Fla. Feb. 15, 2018), aff'd, 791 Fed. Appx. 819 (11th Cir. 2019) (reducing award for emotional distress to from $125,000 to $25,000 where plaintiff employee testified about physical ailments, nervousness, and marriage problems that were causally related to retaliation she suffered); *City of Hollywood v. Hogan*, 986 So. 2d 634, 649 (Fla. 4th DCA 2008) (explaining that the maximum amount of $300,000 "should be reserved for the most egregious cases of unlawful conduct.").

## <u>CONCLUSION</u>

Judgment as a matter of law for FDC is required based on the lack of evidence to support the verdict in Plaintiff's favor. In the event the Court does not enter such a judgment, reduction of the damages award is required based on the applicable standard for those damages. The jury's award of $300,000 for net lost wages and benefits should be reduced to no more than $91,809.32 and the award of $700,000 for emotional pain and mental anguish should be reduced to no more than $20,000.

Respectfully submitted,

*/s/ Lance Eric Neff*                          */s/ Jamie Ito*
Lance Eric Neff (FBN 0026626)        JAMIE ITO
General Counsel                               Florida Bar No. 13553
lance.neff@fdc.floridalegal.com        Jamie@itolaw.net
Florida Department of Corrections    Ito Law, PLLC
501 S. Calhoun Street                       411 Wilson Ave.
Tallahassee, Florida 32399-2500       Tallahassee, FL 32303
(850) 717-3588                                 (850) 284-9517

## CERTIFICATE OF SERVICE

I CERTIFY that a true and correct copy of the foregoing was served on all parties of record by filing via cm/ecf on June 28, 2022.

## CERTIFICATE OF COMPLIANCE

I CERTIFY that this Motion and Memorandum of Law was prepared in Microsoft Word using Georgia 14-point font and that the word count is 6,848 words.

*/s/ Jamie Ito*
**JAMIE ITO**